FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

2014 MAY 20  P 4: 05

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IKEAFANS, INC.**
3304 Riverview Drive
Colonial Beach, VA 22443,

    **PLAINTIFF,**

    v.

**IKEA U.S., INC.,**
<u>Serve</u>:  CT Corporation System
      4701 Cox Road, Suite 301
      Glen Allen, VA 23060,

and

**INTER IKEA SYSTEMS B.V.,**
Olof Palmestraat 1
Delft 2616
The Netherlands,
<u>Serve</u>:  Per the Hague Service Convention
      Ms. Sambo, De Officier van Justitie
      2500 EH, The Hague
      Netherlands

and

**IKEA NORTH AMERICA SERVICES, LLC,**
<u>Serve</u>:  The Corporation Trust Company
      Corporation Trust Center
      1209 Orange Street
      Wilmington, DE 19801,

    **DEFENDANTS.**

Civil Case No. _1:14 CV 584_
_AJT/TCB_

## COMPLAINT

In the face of ongoing threats to its business, Plaintiff IKEAFANS, Inc.

("IKEAFANS") brings this action against Defendants IKEA U.S., Inc., Inter IKEA

Systems B.V., and IKEA North America Services, LLC (collectively, "IKEA") to resolve

a controversy over IKEAFANS' use of the IKEAFANS mark and trade dress, and to remedy the harm suffered by IKEAFANS as a result of IKEA repudiating its license to IKEAFANS, and IKEA's unjust attempts to thwart IKEAFANS' continued operation of its business and website (www.ikeafans.com).

## NATURE OF THE ACTION

1.      IKEAFANS seeks a declaration of the respective rights and legal relations between IKEA and IKEAFANS concerning the parties' respective marks and trade dress, the enforceability thereof, and the right of IKEAFANS to continue operating and growing the business it built with IKEA's knowledge, encouragement, and express authorization.

2.      IKEAFANS seeks a declaration of its rights under the parties' license implied in fact as evidenced by the parties' intent to contract on terms that are evidenced by IKEA's conduct expressly authorizing IKEAFANS to conduct its business activities and accepting, acknowledging, and retaining the benefits of IKEAFANS' commercial activities.

3.      Alternatively, IKEAFANS seeks a declaration of its rights under the parties' license implied in law and, in particular, a declaration of IKEAFANS' license rights under the IKEA marks and trade dress as justice requires to permit IKEAFANS to continue its business operations without IKEA's threats and adverse acts.

4.      IKEAFANS seeks a declaration that IKEAFANS is entitled to quiet enjoyment of the license rights granted to IKEAFANS by IKEA under the contract the parties entered into at least as early as 2007.

5.      IKEAFANS seeks a remedy for IKEA's breach of the parties' contract and license agreement in the form of monetary damages and injunctive relief.

6.      IKEAFANS seeks equitable relief in the form of a declaration that IKEA may not enforce any trademark or trade dress rights as to IKEAFANS due to IKEA's acquiescence, authorization, and encouragement of IKEAFANS' business activities since at least as early as 2007, pursuant to the doctrines of waiver and estoppel.

7.      IKEAFANS seeks a declaration that IKEA's unclean hands preclude IKEA from obtaining any relief.  IKEA has known, authorized, and encouraged IKEAFANS to build and grow its business and the online community at www.ikeafans.com that IKEA now demands IKEAFANS turn over to IKEA for IKEA's own use.  IKEAFANS seeks a declaration that IKEA will be unjustly enriched if it is allowed to repudiate its license to IKEAFANS.  IKEAFANS also seeks compensation for IKEA's unjust enrichment.

## THE PARTIES

8.      Plaintiff IKEAFANS, Inc., is a Virginia corporation with its principal place of business located at 3304 Riverview Drive, Colonial Beach, Virginia 22443. IKEAFANS owns and operates the IKEAFANS website at www.ikeafans.com.

9.      Defendant IKEA U.S., Inc., is a Delaware corporation with its principal place of business located at 420 Alan Wood Road, Conshohocken, Pennsylvania 19428. IKEA U.S., Inc., may be served through its registered agent, CT Corporation System, 4701 Cox Road, Suite 301, Glen Allen, Virginia 23060.

10.     Inter IKEA Systems B.V. is a company organized under the laws of the Netherlands, with its principal place of business located at Olof Palmestraat 1, Delft,

2616, the Netherlands.  Inter IKEA Systems B.V. may be served through an officer or director at the above address, through counsel, Georges Nahitchevansky, Kilpatrick Townsend & Stockton LLP, 1114 Avenue of the Americas, New York, New York 10036, or under the Hague Convention.

11.     Defendant IKEA North America Services, LLC, is a Delaware limited liability company with its principal place of business located at 420 Alan Wood Rd., Conshohocken, Pennsylvania 19428.  Upon information and belief, the members of IKEA North America Services, LLC are not citizens of the Commonwealth of Virginia. IKEA North America Services, LLC, may be served through its agent for service, the Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, Delaware 19801.

12.     Defendant IKEA North America Services, LLC conducts social marketing and advertising campaigns to promote IKEA products in the United States.  IKEA North America has collaborated with IKEAFANS in joint promotional efforts since 2007.

13.     Defendants IKEA U.S. and IKEA North America Services, LLC, are wholly owned subsidiaries of Inter IKEA Systems B.V.  Inter IKEA Systems B.V. owns the IKEA concept and trademarks and licenses rights to use the IKEA trademarks worldwide.  Inter IKEA Systems B.V., IKEA U.S., and IKEA North America Services, LLC, act as a single enterprise in the advertising, sale and promotion of goods and services under the IKEA trademarks and trade dress.

14.    IKEA advertises and sells home furnishings, kitchens, and ready-to-assemble furniture in retail stores across the country and in this district through its website and retail locations, including a store located in Woodbridge, Virginia.

15.    Since about 2010, IKEA has conducted targeted online advertising, including through Plaintiff's website, www.ikeafans.com, which directs online traffic and potential customers to IKEA's own websites, including www.ikea-usa.com. IKEA owns the IKEA-USA.com domain, which is registered through Verisign in Reston, Virginia.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to: 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 & 1338, because it involves a question of rights pursuant to federal trademark statutes; 28 U.S.C. § 1332 because the parties are all citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs; 28 U.S.C. § 2201 because Plaintiff seeks a declaration of rights regarding an actual case and controversy between the parties; and 28 U.S.C. § 1367 because the Court has supplemental jurisdiction over Plaintiff's state-law claims.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

18.    This Court has personal jurisdiction over all defendants pursuant to the Virginia Long-Arm Statute, VA. CODE §§ 8.01-328.1 because: (i) this case arises from IKEA's transactions in this district directed to IKEAFANS, including conducting targeted online advertising on ikeafans.com and granting a license to IKEAFANS in exchange for IKEAFANS providing promotional support and information about IKEA products, services, and customers from IKEAFANS' location in Virginia. Thus, IKEA

has purposely availed itself of the benefits of conducting business in Virginia and purposely engaged in conduct in Virginia which forms the basis of this action; (ii) IKEA entered into an agreement requiring performance in this district; (iii) IKEA regularly conducts business in this district and has substantial, continuing and systematic contacts with Virginia for a substantial period of time predating this lawsuit; and (iv) the resulting harm from IKEA's actions occurred in this district, where Plaintiff conducts the business activities at issue in this action.

## STATEMENT OF FACTS

19.   IKEAFANS.com is a public webspace where consumers go to find information about IKEA products and inspiration to use them.  IKEAFANS provides articles, galleries, and an online forum where visitors and registered members congregate to share their experiences using IKEA products.  Visitors to www.ikeafans.com share helpful tips and decorating ideas and post photos and how-to articles about their own uses of IKEA products.

20.   Susan and James Martin (the "Martins") launched the IKEAFANS.com website in March 2005.  Started as a blog with a section for reader comments, www.ikeafans.com was the product of the Martins combining their loyalty and admiration for IKEA's design and sustainability practices with their recognition of the demand for more IKEA information on the internet.  Their site's popularity grew quickly and within months of its launch, IKEAFANS.com had evolved into an online bulletin board with linked HTML content pages.

21.     From their home in Virginia, the Martins have operated www.ikeafans.com continuously and consistently since March 2005.  Their company, IKEAFANS, owns the site and provides the Martins their livelihood.

22.     IKEAFANS.com has become a leading online resource for IKEA help and information.   With almost a quarter million registered members, the IKEAFANS community draws people around the world seeking information about IKEA products and particularly IKEA kitchens.

23.     IKEAFANS is famous for its presence and the service that it provides to the IKEA community:

> Consumers so strongly desire to collaborate with brands that they are ready to take matters into their own hands, as is the case with Ikea and its customer operated Ikea Fans community website where users exchange information, independent of the retailer.

Kristina Knight, *Half of Americans Believe Fave Brands Aren't Interested in Ideas*, BizReport, May 2, 2014, http://www.bizreport.com/2014/05/half-of-americans-believe-fave-brands-arent-interested-in-id.html.

24.     IKEAFANS, members, community participants, and users are valuable to IKEA and help IKEA build local consumer support.

25.     The IKEAFANS webspace is known as a reliable, independent source of information about IKEA products and services.  As an independent online community, IKEAFANS is a helpful outlet for IKEA customers and potential customers to express their views and enthusiasm about IKEA products and services.

26.     IKEAFANS has built its reputation and become well-known and trusted from years of creating and publishing original content and collecting information about IKEA products and uses for them.  The IKEAFANS website has established itself as the primary online source for reliable information about IKEA kitchens and the premier online forum for sharing home-improvement ideas incorporating IKEA products.

27.     At all times, www.ikeafans.com included conspicuously on its landing page and other portions of the website statements, including a disclaimer, reminding the public that IKEAFANS is independent of IKEA.

28.     IKEA actively has monitored the IKEAFANS website, but has not controlled the content published at IKEAFANS.com, the design of the IKEAFANS.com webspace, or the business operations of IKEAFANS.

29.     From its start in 2005, IKEAFANS has received direct and indirect support from all levels of the IKEA organization from its marketing executives to franchisees.

30.     By early 2007, IKEA's public relations team at Ketchum, Inc., "had taken notice" of IKEAFANS' "fabulous site" and began working with IKEAFANS to "keep [IKEAFANS] in the loop of the latest and greatest from IKEA."

31.     IKEA invited IKEAFANS and the Martins to official IKEA events introducing new furniture lines and launching the annual IKEA catalog.

32.     In September 2007, IKEA representatives, including Global Communications Manager Magnus Holst, visited the United States and met with the Martins to discuss how their companies would cooperate to their mutual benefit.  In meetings held in Conshohocken, Pennsylvania, IKEA and IKEAFANS agreed they

would continue working together to promote IKEA products and services through the IKEAFANS community. The companies agreed to publish IKEA product information through the IKEAFANS.com website, IKEA agreed to provide advance copies of forthcoming IKEA catalogs and out-of-print copies of old catalogs, and agreed to grant access to behind-the-scenes information and exclusive interviews with IKEA representatives. IKEAFANS agreed to provide IKEA with customer feedback and other market data collected through its website. IKEA praised IKEAFANS and encouraged and authorized IKEAFANS to continue operating its website and conducting business in the same manner IKEAFANS had been operating.

33.     With IKEA's full knowledge and authorization, IKEAFANS moved forward in promoting IKEA's products and assembling consumer feedback that IKEA monitored and used in advertising and selling its products. In exchange, and with IKEA's knowledge and authorization, IKEAFANS sold advertising to those who wished to market their services to the IKEA community. The parties' understanding was that IKEAFANS would be allowed and expected to continue its activities in exchange for which IKEA would receive the benefits it desired.

34.     By the end of 2007, over three dozen IKEA co-workers (IKEA employees) had become registered members of IKEAFANS.com. IKEA representatives shared information about the company and its products on the IKEAFANS' forums and worked with IKEAFANS to publish information about IKEA products on the IKEAFANS.com website.

35.    IKEA provided IKEAFANS with product instructions, product information, catalog images and text, and company information to use in connection with IKEAFANS.

36.    In return, IKEAFANS authorized IKEA to reference IKEAFANS in its efforts to develop an effective online social-marketing campaign.  In 2009, at IKEA's request, IKEAFANS provided a high-resolution image of the IKEAFANS logo for posting on IKEA's official Facebook page.  IKEA provided a link directing its IKEA-USA Facebook-page visitors to IKEAFANS:



37.    In return, IKEAFANS continued to perform under the agreement it had reached with IKEA.  IKEAFANS maintained its site as an IKEA-focused, public webspace that presented an independent and loyal source of IKEA information. IKEAFANS also provided feedback to IKEA about IKEA online publications, for example notifying IKEA of broken links on IKEA websites.

38.    Upon information and belief, the IKEAFANS website was the subject of discussion internally at IKEA and had been mentioned numerous times in an internal

IKEA global newsletter.  Internally, IKEA studied how to reap more commercial benefit from its relationship with IKEAFANS.  In particular, IKEA collected information about how to use social media online and gathered user traffic information from IKEAFANS. IKEA studied consumer behavior on IKEAFANS.com to gain insight into consumer feedback and opinions on IKEA products.  Thus, IKEA continued to receive the benefits of the agreement it had reached with IKEAFANS.

39.    In 2009, IKEA collaborated with IKEAFANS for the IKEAFANS "Biggest IKEA Fan Contest."  IKEA provided the grand prize: a $100 gift card to IKEA.  The winner also received an invitation to the IKEA catalog launch in New York City as a guest of IKEAFANS.

40.    The next year, celebrating IKEA's 2011 catalog, IKEA invited IKEAFANS to address the audience at the official IKEA event.  IKEA asked IKEAFANS to announce the "What's Your Story" contest that would run that summer.  IKEA provided hundreds of dollars in gift cards awarded to the winners.  IKEAFANS was invited to distribute IKEAFANS promotional materials in the official IKEA gift bag (the swag bag) handed out to event attendees.

41.    The IKEA-IKEAFANS relationship was "symbiotic," according to IKEA.

42.    IKEA employees requested and were granted membership and access to the IKEA co-worker private forum at IKEAFANS.com.

43.    Thus, IKEAFANS continued to perform and IKEA continued to receive the benefits pursuant to the agreement they had reached.

44.     In April 2011, IKEAFANS received a letter from a law firm purporting to represent IKEA regarding a domain name (www.ikeawave.com) IKEAFANS owned. The letter threatened legal action by April 21, 2011, so Susan Martin immediately contacted a close contact at IKEA to handle the matter. IKEA's response the next day assuaged the Martins' concern: "It's all taken care of, someone will be in touch with you—probably from Sweden." Nothing further happened, and IKEAFANS and IKEA continued doing business as usual.

45.     This confirms IKEA had agreed that IKEAFANS had permission and any license necessary to operate its website and business in exchange for the benefits that IKEAFANS conveyed to IKEA, including valuable consumer and market research data and increased sales.

46.     Later in 2011, IKEA introduced IKEA Share Space (http://www.theshare-space.com/), an online webspace where, like IKEAFANS.com, IKEA customers can post pictures of their IKEA projects, comment on other posters' ideas, and share links to non-IKEA sources of inspiration, ideas, and products. But traffic at IKEA's Share Space forum was a fraction of the volume of users at IKEAFANS.com.

47.     For almost seven years, IKEA fully supported IKEAFANS, reaping the benefits of their agreement and symbiotic relationship. As one of the premier sources of information and inspiration about IKEA kitchens, IKEAFANS has induced countless consumers to spend thousands of dollars on IKEA kitchen purchases. The "Kitchen Planning" forum at IKEAFANS.com is, and always has been, one of the busiest areas in the community.

48. Until January 2012, IKEA had not objected to Plaintiff's using the IKEAFANS name or operating the IKEAFANS.com domain. Until January 2012, IKEA had not complained about the IKEAFANS logos, taglines, or the look and feel of IKEAFANS.com, which has remained largely unchanged since 2007.

49. But in January 2012, after seven successful years working together, things suddenly changed. Despite years of collaboration and cross-marketing, IKEA informed IKEAFANS that the "use of the IKEA name and mark in a third party's business name cannot continue." IKEA threatened to dispute ownership of the IKEAFANS.com domain and other related domains owned by IKEAFANS.

50. Having attempted to build its own online community at IKEA Share Space, IKEA turned on IKEAFANS and demanded www.ikeafans.com be turned over to IKEA for IKEA's own use.

51. Despite their collaborative history, agreement, and IKEAFANS' license, IKEA has demanded that IKEAFANS immediately cease using the IKEAFANS business name, transfer to IKEA all related domain names owned by IKEAFANS, transition the IKEAFANS website to IKEA, and remove from the IKEAFANS website all logos, symbols or other source identifying indicia and images (without regard to whether IKEA directly provided such materials) relating to IKEA.

52. After years of collaboration, IKEA demanded that IKEAFANS hand over to IKEA the online community at www.ikeafans.com that the Martins built from the ground up over the last nine years. After trying to launch its own community, IKEA decided to take for itself what IKEAFANS had built.

53.     After two years of stop-and-start negotiations, escalating threats, and IKEA's hard-ball tactics, the parties have reached an impasse and IKEAFANS seeks the Court's resolution of this contested dispute.

## COUNT I – DECLARATION OF NONINFRINGEMENT BASED ON LICENSE IN FACT

54.     Plaintiff IKEAFANS hereby incorporates and realleges Paragraphs 1-53 above as if fully set forth herein.

55.     At least as early as 2007, IKEA, by and through the oral agreement of its representatives, and confirmed by the subsequent course of conduct of the parties, granted IKEAFANS a license to use the IKEA marks and trade dress for the operation of IKEAFANS' website and business in the manner described above.

56.     At least as early as 2007, IKEA was aware of the IKEAFANS business operations, the IKEAFANS.com webspace, and the commercial activities conducted by IKEAFANS through IKEAFANS.com.  IKEA has remained aware of those operations and activities by, *inter alia*, having its employees registered as IKEAFANS members as early as 2005.

57.     In exchange for the benefits conveyed upon IKEA, including the collection of valuable consumer and market research data and increased sales, IKEA authorized IKEAFANS to sell advertising to third parties through the IKEAFANS website and operate the IKEAFANS Marketplace and Directory where third-party products and services are advertised.

58.     IKEA did not limit the license to a period of time or geography.

59.    A material term of the license was that, for so long as IKEAFANS maintained a focus on servicing and growing the community of IKEA customers and potential customers to the benefit of IKEA, IKEAFANS would be entitled to pursue continued growth and quiet enjoyment of its business, which, as IKEA was made aware when it solicited and received IKEAFANS' commitment, has come to be the livelihood and sole source of income for IKEAFANS' founders, the Martins.

60.    IKEA entered into a contract with IKEAFANS to grant IKEAFANS a license under the asserted rights in exchange for the benefits IKEAFANS conferred upon IKEA. IKEA knowingly sought, received, and appreciated these benefits, realizing the full commercial value of its agreement with IKEAFANS.

61.    IKEAFANS has at all times performed its duties according to the terms of the contract. In reliance on its agreement and relationship with IKEA, IKEAFANS has over the years continued to invest in the maintenance and growth of its business and continues to focus on servicing the IKEA community. IKEA knowingly continues to realize the benefits from IKEAFANS' operations, including increased sales from IKEAFANS' promotional efforts. IKEA has retained the full benefit and commercial value of its contract with IKEAFANS.

62.    As a result, IKEA has a legally enforceable license obligation to IKEAFANS pursuant to the enforceable contract between the parties.

63.    IKEA has nevertheless expressly alleged in writing and through discussions with the Martins that IKEAFANS' activities are in violation of IKEA's rights and that IKEAFANS must cease and desist its activities. IKEAFANS denies these allegations.

There is a definite, concrete, real and substantial dispute concerning IKEAFANS' rights and obligations. A justiciable case and controversy therefore exists between IKEAFANS and IKEA as to the license granted to IKEAFANS by IKEA.

64.      IKEAFANS therefore seeks a declaration that it has a valid and enforceable license under and to the IKEA marks and trade dress pursuant to the terms agreed to by IKEA's representatives.

## COUNT II – DECLARATION OF NONINFRINGEMENT BASED ON LICENSE IMPLIED IN LAW

65.      Plaintiff IKEAFANS hereby incorporates and realleges Paragraphs 1-64 above as if fully set forth herein.

66.      Alternatively, at least as early as 2007, IKEA, by and through the oral representations of its representatives granted IKEAFANS a license implied in law to use the IKEA marks and trade dress for the operation of IKEAFANS' website and business in the manner described above.

67.      At least as early as 2007, IKEA was aware of the IKEAFANS business operations, the IKEAFANS.com webspace, and the commercial activities conducted by IKEAFANS through IKEAFANS.com. IKEA has remained aware of those operations and activities at all times since that time.

68.      In exchange for the benefits conveyed upon IKEA, including the collection of valuable consumer and market research data and increased sales, IKEA permitted IKEAFANS to sell advertising to third parties through the IKEAFANS website and

operate the IKEAFANS Marketplace and Directory where third-party products and services are advertised.

69.     At all times since at least early 2007, IKEA has had actual knowledge of and appreciated the benefits of its agreement with IKEAFANS.

70.     IKEA did not limit the license grant to a period of time or geography.

71.     A material term of the license intended by the parties was that, for so long as IKEAFANS maintained a focus on servicing and growing the community of IKEA customers and potential customers to the benefit of IKEA, IKEAFANS would be entitled to pursue continued growth and quiet enjoyment of its business, which, as IKEA was made aware when it solicited and received IKEAFANS' commitment, has come to be the livelihood and sole source of income for IKEAFANS' founders, the Martins.

72.     IKEA intended to contract with IKEAFANS to grant IKEAFANS a license under the asserted rights in exchange for the benefits IKEAFANS conferred upon IKEA. IKEA knowingly sought, received, and appreciated these benefits, realizing the full commercial value of its agreement with IKEAFANS.

73.     IKEAFANS has at all times performed its duties according to the terms agreed upon with IKEA.  In reliance on their agreement and relationship with IKEA, IKEAFANS has over the years continued to invest in the maintenance and growth of its business and continues to focus on servicing the IKEA community.  IKEA knowingly continues to realize the benefits from IKEAFANS' operations, including increased sales and brand development from IKEAFANS' promotional efforts.

74.     IKEA benefits from IKEAFANS in the form of increased sales and brand development and has retained the full benefit and commercial value of its agreement with IKEAFANS.

75.     As a result, IKEA has a legally enforceable license obligation to IKEAFANS.

76.     IKEA has nevertheless expressly alleged in writing and through discussions with the Martins that IKEAFANS' activities are in violation of IKEA's rights and that IKEAFANS must cease and desist its activities.  IKEAFANS denies these allegations.

77.     IKEA's acceptance and retention of the benefits realized from the effort of IKEAFANS to develop the IKEAFANS community, promote IKEA products and services, build the online IKEAFANS community, and build consumer loyalty and interest in IKEA products without just compensation to IKEAFANS would be inequitable.

78.     Permitting IKEA to terminate the license rights IKEAFANS has enjoyed and used to build its business for the last nine years and simply take the IKEAFANS.com site from IKEAFANS and misappropriate it for its own use and furtherance of IKEA's own commercial activities would be inequitable.

79.     There is a definite, concrete, real and substantial dispute concerning IKEAFANS' rights and obligations.  A justiciable case and controversy therefore exists between IKEAFANS and IKEA as to the license granted to IKEAFANS by IKEA.

80.     IKEAFANS therefore seeks a declaration that it has a valid and enforceable license under and to the IKEA marks and trade dress pursuant to the terms agreed to by IKEA's representatives.

### COUNT III – BREACH OF LICENSE AGREEMENT

81.     Plaintiff IKEAFANS hereby incorporates and realleges Paragraphs 1-80 above as if fully set forth herein.

82.     As stated above, IKEA entered into an enforceable agreement with IKEAFANS at least as early as 2007 thereby granting IKEAFANS a license under and to the IKEA marks and trade dress for IKEAFANS' business including operating its commercial website www.ikeafans.com to generate advertising sales revenue.   In exchange for the benefits knowingly sought and received by IKEA from IKEAFANS' commercial activities, IKEAFANS was and is entitled to sell advertising to third parties through the IKEAFANS' site and operate the IKEAFANS.com Marketplace and Directory.   Consequently, IKEA entered into a legally enforceable and binding contractual obligation with IKEAFANS.

83.     IKEAFANS has at all times performed its duties according to the terms agreed upon with IKEA.

84.     In 2012, IKEA indicated that it was unilaterally changing the terms of the license granted to IKEAFANS without additional compensation.  The parties entered into discussions to resolve the dispute and, on or about May 14, 2014, IKEA terminated those discussions and indicated that it would proceed as originally threatened: IKEA would

take the IKEAFANS.com domain and effectively terminate IKEAFANS' ability to conduct its business.

85.     IKEA has repudiated or otherwise anticipatorily breached its binding contract with IKEAFANS by and through explicit statements that it will no longer perform its obligations, thereby materially breaching terms of the contract.

86.     IKEAFANS has been injured and damaged by IKEA's material breach of the contract.

## COUNT IV – DECLARATION OF TRADEMARK UNFORCEABILITY DUE TO ACQUIESCENCE, WAIVER, AND ESTOPPEL

87.     IKEAFANS hereby incorporates and realleges Paragraphs 1-86 above as if fully set forth herein.

88.     IKEAFANS has at all times maintained its website and conducted its business with the full knowledge and express or implied approval of IKEA including, without limitation, IKEA's advertising of its products and services through IKEAFANS' website.   IKEAFANS' activities have conferred substantial benefits on IKEA, which IKEA has accepted and affirmatively acknowledged to IKEAFANS.

89.     IKEAFANS has at all times accurately represented to consumers and potential consumers its relationship with IKEA and, upon information and belief, no likelihood of consumer confusion has resulted or will result from IKEAFANS' activities, which have been ongoing for over nine years.  No detriment to the public will occur if IKEAFANS is allowed to continue operation of its business in the same manner as it has

done for over nine years, and no benefit to the public will be realized if IKEA succeeds in commandeering IKEAFANS' business and taking away its website for IKEA's own use.

90.     Based upon IKEA's representations and with IKEA's continued support and authorization, IKEAFANS has relied on IKEA's words and deeds and continued to invest in its business with the expectation that it would be allowed to continue operating and growing its business.   That investment will be lost if IKEAFANS is no longer allowed to pursue its business.

91.     IKEA has expressly alleged in correspondence and in discussions with the Martins that IKEAFANS' activities are in violation of IKEA's rights and that IKEAFANS must cease and desist its activities.  IKEAFANS denies these allegations.

92.     There is a definite, concrete, real and substantial dispute concerning IKEAFANS' rights and obligations.  A justiciable case and controversy therefore exists between IKEAFANS and IKEA as to the enforceability of IKEA's trademark and trade dress rights.

93.     IKEAFANS therefore seeks a declaration that IKEA's trademarks and trade dress are unenforceable as to IKEAFANS pursuant to federal and state trademark laws, including 15 U.S.C. § 1115, under the doctrines of acquiescence, waiver, and estoppel.

## COUNT V – DECLARATION OF UNFORCEABILITY
## DUE TO UNCLEAN HANDS

94.     IKEAFANS hereby incorporates and realleges Paragraphs 1-93 above as if fully set forth herein.

95.     IKEAFANS has at all times maintained its website and conducted its business with the full knowledge and express or implied approval of IKEA including, without limitation, IKEA's advertising of its products and services through the IKEAFANS' website.  IKEAFANS' activities have conferred substantial benefits on IKEA, which IKEA has accepted and affirmatively acknowledged to IKEAFANS.

96.     To induce additional sales of its products, IKEA offers installation of those products by independent installation professionals recommended by and under agreement with it for substantial projects, such as the installation of kitchens.  IKEA ties the offering of such services to the sale of its branded goods under the IKEA trademarks and trade dress.

97.     As part of its business activities, IKEAFANS sells advertising to independent third-party installation professionals.  IKEA is seeking to use its trademarks and trade dress as a basis for preventing IKEAFANS from conducting its business of offering assistance to customers seeking to hire independent installation professionals despite IKEA authorizing IKEAFANS to offer those services.

98.     IKEAFANS has at all times accurately represented to consumers and potential consumers its relationship with IKEA and, upon information and belief, no likelihood of consumer confusion has resulted or will result from IKEAFANS' activities, which have been ongoing for over nine years.  IKEA is therefore seeking to overextend its trademark and trade dress rights to unfairly and unduly eliminate competition for its sole benefit and to the detriment of consumers.

99.   IKEA's acts constitute unfair competition, trademark misuse, and anticompetitive behavior contrary to law.

100.   IKEA has expressly alleged that IKEAFANS' activities are in violation of IKEA's rights, and that IKEAFANS must cease and desist its activities.  IKEAFANS has denied these allegations.  There is a definite, concrete, real and substantial dispute concerning IKEAFANS' rights and obligations.  A justiciable case and controversy therefore exists between IKEAFANS and IKEA as to the enforceability of IKEA's trademark and trade dress rights.

101.   IKEAFANS therefore seeks a declaration that IKEA's actions are barred by the doctrine of unclean hands pursuant to federal and state trademark laws, including the Lanham Act, 15 U.S.C. § 1115.

### COUNT VI – UNJUST ENRICHMENT

102.   IKEAFANS hereby incorporates and realleges Paragraphs 1-101 above as if fully set forth herein.

103.   IKEAFANS has at all times maintained its website and conducted its business with the full knowledge and authorization of IKEA.  IKEAFANS' activities have conferred substantial benefits on IKEA, including benefits resulting from the goodwill IKEAFANS has established in its name and reputation from the operation of its website and business.   IKEA has affirmatively acknowledged and accepted the substantial benefits it has received from IKEAFANS' efforts, in exchange for which IKEAFANS receives the right to continue operating its website and business for so long as it complies with the terms of the license granted to it by IKEA.

104.   After years of IKEAFANS building its brand, its business, and establishing IKEFANS.com, IKEA now seeks to deprive IKEAFANS of the full value of the business the Martins built by preventing IKEAFANS from continuing operation of its website and business, despite IKEA's express grant of permission, thus destroying IKEAFANS' future income stream from its operations.

105.   If IKEAFANS must cease its operations, IKEA will be unjustly enriched, and IKEAFANS is entitled to compensation for the full value of the benefits it has conferred upon IKEA.

## RELIEF REQUESTED

Plaintiff IKEAFANS respectfully requests that the Court enter judgment in its favor and against Defendants IKEA U.S., Inc., INTER IKEA Systems B.V., and IKEA North America Services, LLC by:

A.   Adjudging and declaring that IKEAFANS has a license to use the IKEA marks and trade dress in the operation of its business under the terms expressly and impliedly agreed to by IKEA;

B.   Enjoining Defendants from repudiating the license granted to IKEAFANS;

C.   Enjoining Defendants from undertaking any action to disturb the rights of IKEAFANS to continue using the IKEAFANS.com domain, or taking any action inconsistent with the license granted to IKEAFANS;

D.   Awarding monetary damages in an amount to be proven at trial;

E.   Awarding to IKEAFANS the costs of this action;

F.   Awarding to IKEAFANS its attorneys' fees; and

G.     Awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMANDED

Plaintiff IKEAFANS hereby requests a trial by jury for all triable issues.

Dated: May 20, 2014

Respectfully submitted

**PLAINTIFF IKEAFANS, INC.**
**By Counsel**

Bernard J. DiMuro, Esq. (VSB #18784)
Michael S. Lieberman, Esq. (VSB #20035)
*Counsel for Plaintiff Ikeafans, Inc.*
**DIMUROGINSBERG**, PC
1101 King Street, Suite 610
Alexandria, Virginia 23314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
E-mail: bdimuro@dimuro.com;
mlieberman@dimuro.com


/s/

Cecil E. Key, Esq. (VSB #41018)
*Co-Counsel for Plaintiff Ikeafans, Inc.*
**LAW OFFICES OF CECIL KEY, LLC**
1934 Old Gallows Road, Suite 350
Vienna, VA 22182
Telephone: (703) 752-6276
Facsimile: (703) 752-6201
E-mail: cecil@keyiplaw.com


/s/

Donald R. Taylor, Esq. (TXB #19688800)
Cabrach J. Connor, Esq. (TXB #24036390)
Jennifer Tatum Lee, Esq. (TXB #24046950)
*Of-Counsel for Plaintiff Ikeafans, Inc.*
**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, TX 78701
Telephone:  (512) 473-2257
Facsimile: (512) 478-4409

E-mails: dtaylor@taylordunham.com;
cconnor@taylordunham.com;
jtatum@taylordunham.com

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

Defendants are hereby notified they are legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Defendants know, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (collectively "Potential Evidence").

As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact-manager information, internet-usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored. These sources may also include

any personal electronic, digital, and storage devices of any and all of Defendants' agents, resellers, or employees if Defendants' electronically stored information resides there.

Defendants are hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendants' claims and/or defenses. To avoid such a result, Defendants' preservation duties include, but are not limited to, the requirement that Defendants immediately notify their agents and employees to halt and/or supervise the auto-delete functions of Defendants' electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion. Included in this litigation hold notice are the following custodians, including but not limited to, Georges Nahitchenvansky, Leontyne Green, Magnus Gustaffson, Jesper Madsen, Kathy Boerner (Ketchum, Inc.), Rich D'Amico, Patrick Rosen, Pernille Lopez, Marty Marsden, Marty McGuire, Magnus Holst, Mike Baker, Frederik Rabe, Martin Broden, Richard Menzies, Joseph Roth, Mikael Theander, Gerry Moran, Brooke Nelson, Moma Liss, Fiona Brichaut, and Bo Lippert-Larson.